Final case, Pfizer v. McNeil. As you know, Judge Sack is recused from this case, and the way that we will proceed is that we will endeavor to handle this as a two-judge case. If it turns out that we can't agree, then we will get a third judge who will be able to listen to the arguments. If that third judge wants to have a re-argument, that will be an option that Judge Hall and I will respect. In the normal course, if we had had enough time, we would have gone for a third judge, but given the press of time, we will do things as we do as a matter of standard procedure in this kind of situation, and we will hear the case. Thank you. We understand, and thank you very much, and we also thank Judge Sack for his attention to this. Thank you. Please proceed. Good afternoon, Your Honors. Lynn Nooner from Simpson-Thatcher & Bartlett. Together with my partner, Bill Russell, we represent appellant Pfizer, Inc., and our clients are present in the courtroom this afternoon. This appeal turns on the meaning of the term Advil in a 28-year-old consent judgment negotiated and agreed to by the party's predecessors. The consent judgment at issue imposes a restriction on advertising for Advil. We contend that this judgment applies to the adult Advil that was being litigated and does not apply to the pediatric Advil products that were simply not in existence in the 1980s when the underlying cases were litigated. Just so I'm clear, Ms. Nooner, the substance in the pediatric product is ibuprofen, right? Judge Hall, the answer is yes. Ibuprofen is the medicine, the active ingredient in both the adult Advil and the infant's children and junior strength Advil. Wasn't that the substance that was the subject of essentially Judge Conner's various decisions in this matter or in the preceding matter? Yes. This is exactly the heart of the matter. Ibuprofen, is it the same across all the products and does it have the same effects? It is not the same? The medicine is the same. The products are different. There are different dosages, there are different formulations, and they're being used on different populations that themselves have different physiological characteristics. So let me be clear. The product that was at issue in the prior underlying litigation was ibuprofen 200 milligrams that was being utilized in adult populations. One very important issue is what was Judge Conner ruling on when he made conclusions that ibuprofen does not have the same effects on the stomach? McNeil would have you believe that all of his conclusions turned solely and exclusively on mechanism of action, i.e. that ibuprofen suppresses prostaglandin synthesis in the stomach, which can lead to problems for the gastrointestinal tract. I would submit that if you look very carefully at the Advil 1 opinion, which is where the clinical and decisions regarding the characteristics of these two medicines are found, you will see that the opinion about mechanism of action is found at page 572 of the opinion, which is the part describing in the background the two or three medicines, aspirin, acetaminophen, and ibuprofen. When you get, and this is very important, to the actual findings about stomach upset and gastrointestinal effect, what you see at pages 576 and 584 is Judge Conner talking about the evidence regarding users. What is that? The evidence are the clinical studies. The clinical studies were taking place solely on adults. You understand from the record the pediatric products simply were being developed. They hadn't been approved even for prescription use. No studies had been run. The Big Camp study, the Boston Fever study, those took place afterward in the 90s. And the two pediatric medicines we're talking about the most, which are infants Advil and children's Advil, were not approved for use until 1996 and 1998. So the critical issue is this. McNeil would have you believe that ibuprofen is ibuprofen is Advil was used to refer to ibuprofen and therefore the negative consequences of ibuprofen from the Advil 1 decision have to apply every time you see ibuprofen as the active ingredient. And that's what I would submit is the fundamental flaw in their analysis. Your argument, I take it, is that because the judgment, in your view, when interpreted in light of the document incorporated by reference, is ambiguous as to whether the judgment applies to pediatric Advil, that you are entitled to offer extrinsic evidence. That's really your argument, isn't it, in a is that under this court's precedence in Barcia and Perez, that consent decree has to be unambiguously clear in its mandate. It can leave no room for uncertainty in the recipients of the decree. So my first line argument is that the word Advil in this consent final judgment is not referring to pediatric products. And I would submit as a first line that this court can determine based on what I've just said, that the consent final judgment does not apply to pediatric products. I think you can also, under ITT Continental Bakery, which is the Supreme Court's precedent, look at the circumstances surrounding the formation of this judgment without actually violating the four corners rule. Under the Supreme Court precedent, those surrounding circumstances are not even extrinsic evidence. So that means you can also look at the consent final judgment from Advil 1, which clearly helps us, because it refers to Advil, ibuprofen products, or ibuprofen in general, in a list, meaning they're not all synonymous. These are different. Can you give examples of the kinds of extrinsic evidence that would show that your interpretation of the consent judgment is the right one? Yes, Your Honor. So extrinsic evidence would be, for example, the party's course of conduct. In the 1990s, in 1996, when AHP introduced the children's medicine, it actually advertised the claim that's at issue here. So it said, the fact is, children's Advil is as safe on a child's stomach as children's Tylenol. That's course of conduct. AHP, the predecessor, actually advertised this claim. And a that Tylenol makers, back in 1996, when this medicine came on the market, tried to do a negative claim. They said, my doctor said that children's, that, here it is. It's 1996. My doctor said that children's Tylenol won't irritate a child's stomach the way ibuprofen can. So they made the negative claim that they say right now they're allowed to make. And what happened? We challenged it. We went to the networks. We said, that's not fair. And ABC actually agreed with us and took their ad off the air and said, Judge Connor was silent as to this children's products and furthermore said that the, there was no basis to extrapolate adult medicine to children's. Is all of this in the record? No, and that is just what I was about to say. This is not in the record because it's extrinsic and that's a response to Chief Judge Katzmann's question. The point is, if you thought there was ambiguity, two reasonable competing interpretations, both have logic and are compelling, then what you would find, and this is our last line of argument, is that this consent final judgment is, in the end, an ambiguous document. And at that point, you would remand for discovery and further proceedings where we do go into course of performance. And I would put in deposition testimony and affidavits from the AHP executives and the outside counsel at Arnold & Porter because we've spoken with them. They sure will say they never, ever, ever meant to give up claims about pediatric products. They simply didn't exist and there's no way of self-respecting, sorry. Okay, so they didn't exist so there was no reason one way or the other to address pediatric stuff, right? They didn't, almost in one step further. They didn't exist so they certainly did not tie their hands, wouldn't have agreed in the settlement agreement or in this settlement and anticipated that children are not little adults. The FDA held them to different standards. So there was reason to believe in 1989 that ibuprofen, the medicine you were asking about, would actually have more benign impacts on children's stomach because they have thicker mucosal lining, they have a higher pH baseline, they have less H. pylori bacteria, they have actually more prostaglandins in their stomachs. So even though ibuprofen, the mechanism of action, is suppressing the prostaglandins, children have more. They're also not alcoholics. They don't use steroids. They don't use it for long-term use. Tends to be an episodic periodic dose for high fever that we moms give our babies. So the AHP executives would not have agreed without any data, without any clinical findings, to tie their hands for all future more about this. And respectfully, Judge Conner wasn't making decisions and he had that very interesting letter to the parties where he said, I don't want to be a czar of OTC drug advertising. I'm not going to render advisory opinions. I'm ruling only on what's before me. And that in this record is undisputably only adult clinical studies with respect to this 200 milligrams dose in adult populations. I see I've gone over my time. I'll reserve. Thank you. Thank you very much. Good afternoon. May it please the Court, Steve Zalesin for Appley McNeil. I think it's useful to remind ourselves how this particular dispute between the parties began. The ad that Pfizer ran that spawned this controversy, which is in the record, unlike most of the things that my adversary referred you to, at appendix page 29, said the following. It said, quote, ibuprofen, the active ingredient in infant's Advil, has a comparable incidence of digestive system adverse events overall to acetaminophen, the active ingredient in infant's Tylenol. That was the ad that they ran, which provoked a protest, which eventually led to this declaratory judgment action. And that claim that the ingredient ibuprofen is overall equivalent to acetaminophen, the ingredient in the stomach digestive system events, is precisely the claim that Judge Conner's preliminary injunction. Isn't the, I mean, the challenge is this, that it seems that Advil, too, like the judgment of consent itself, can arguably be read, I mean, so the argument would go, to define Advil in at least two different ways. One of which includes future ibuprofen products, and one which doesn't. So you could read it as an OTC internal analgesic whose principal active ingredient is ibuprofen, which would include pediatric Advil. That's one way to read it. But you could also read it as the OTC internal analgesic whose principal active ingredient is ibuprofen, that the predecessors, that Pfizer's predecessors manufactured and sold at the time that the decision was written, which would exclude pediatric Advil. And the latter reading is suggested by Advil's, too, use, arguably, of the present tense. And so you've got this, you know, you have two And so for this reason, the argument would be that the, that Advil, too, doesn't resolve the consent judgment's ambiguity. So, Chief Judge Katzmann, I think if we were looking in a vacuum at the Advil, too, consent judgment, and perhaps even the Advil, too, decision, and nothing else, you might, I would say that it's still unambiguously clear. It says nothing about Advil. Every one of these products is Advil. But as the district court found, although the more logical reading is the one that it covers all Advil ibuprofen products, because they're one and the same, it's plausible to say that it might have referred only to the so-called adult product, which, by the way, is labeled and approved for people ages 12 and up. But the so-called adult product that was on the market in 1989. The critical issue, though, in this case, Your Honor, is that we are not looking just at the contract, just at the consent judgment in a vacuum, as, for example, was the case in the JA apparel decision that Your Honor was on the panel on, where there were two plausible interpretations. We are looking at it in the context of the documents, the materials that are explicitly incorporated by the judgment or the contract, which we didn't have in JA apparel. And that is the Advil 2 decision itself, which in turn explicitly cross-references and adopts the findings in Advil 1. Now, Advil 1 was a final judgment. The only thing left to be decided in Advil 1 was damages. It was a final trial on the scientific findings he had made in Advil 1. That's the only scientific record that exists. Advil 2 was simply about the question whether the ad campaign on television at the time, like Tylenol, Advil doesn't upset my stomach, conveyed the message that the judge, Judge Conner, had already determined to be false. That is that the two products are equal with respect to overall digestive system effects. And if we look at Advil 1, and understanding Advil 1 is the absolute key to this case, and I agree with Ms. Nooner, it's useful to look at the Advil 1 decision and it's useful to look at the Advil 1 consent final judgment. So let's do both. In the Advil 1 decision, Judge Conner talks about ibuprofen, the drug, the drug itself. What kind of drug is it? It's a non-steroidal anti-inflammatory drug. How does it work? It works by suppressing prostaglandins. What does that do? It relieves pain and inflammation, but it also compromises the digestive system because the PGs also protect the stomach lining. As a result, like aspirin and every other NSAID, it has a propensity to cause gastrointestinal side effects, including GI erosion, occult bleeding, massive GI hemorrhage, etc. All of which, he said, indisputably occur with ibuprofen, but not with acetaminophen. So the rules of the road that emerged from the Advil 1 litigation were that Tylenol is gentler to the stomach, is safer on the digestive system, and can make that advertising claim. And Judge Conner put that in his decision, and then the parties in the consent final judgment, which starts at page A169 of the appendix, said that in the judgment itself. So the judgment uses the word ibuprofen over and over and over again. For example, paragraph 1d, McNeil is enjoined from saying that Tylenol provides relief, quote, without the stomach irritation you can get with or other claims that equate the irritation possible with aspirin and ibuprofen. But this injunction does not bar defendants from advertising that quote, Tylenol doesn't irritate your stomach the way aspirin or even ibuprofen can, unquote. And that line of discussion proceeds paragraph after paragraph. 2a talks about ibuprofen, 2b, 2c, 2d. Paragraph 3, every single paragraph of the consent final judgment is about how acetaminophen or Tylenol compares with ibuprofen, the drug. You know, it's the same drug, whether it's given to an 18-year-old or a 14-year-old or a 12-year-old or a 10-year-old. These are not, this is not a movie that's appropriate for some adults, but not for some children. It's a drug that has properties. The FDA warning labels are identical across all the products. Judge Connor drew no distinction based upon particular populations. Hey, there were no studies conducted or presented in evidence in the 1980s litigation about 12 to 18-year-olds. That's just a fact. But, because that's not the way drugs are studied, but Advil then and today was labeled for children ages 12 and up, as well as adults. And the dosage, by the way, is the same as well. A junior strength Advil dose for a child age 6 to 10 is two 100 milligram tablets. For an adult, it's one 200 milligram tablets. Same drug, same dose, same label warnings, same properties, same propensities. And the controlling decision here, as we described in our brief, is the Wilder versus Bernstein decision. Advil was being used in children. It was labeled for children 12 and up in 1989 when this agreement or consent judgment was entered. It was under development, a pending FDA application for approval, which was pediatric use was on the way. And every reason for Pfizer's predecessor to say in the consent judgment that pediatric products were excluded if that had been their intent. And that's exactly the situation that the court faced in Wilder with the city's foster care program for so-called kinship care, which was in development, regulations pending, but not yet approved . . . . . . . . .  . . . . . . . . . You're saying that there's an explicit statement that covers your client's view? In the Wilder case? Not in the Wilder, but in the judgment in Advil 2 and Advil 1. The judgment in Advil 1 . . . And how do we incorporate Advil 1 into Advil . Do you think that includes all documents that might've been . . .  . . . . . . .  . No, it does not include, for example